UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STONE POINT ADVISORY, LLC (D/B/A IQ BANKER),

              Plaintiff,

              v.

S&P GLOBAL MARKET INTELLIGENCE, INC. and S&P GLOBAL, INC.,

              Defendants.

25-CV-773 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

This is a trade-secret and breach-of-contract dispute. Plaintiff Stone Point Advisory, LLC ("IQ Banker") was approached by Defendants S&P Global Market Intelligence, Inc. ("SPGMI") and S&P Global, Inc. ("SPG," and collectively, "S&P" or "Defendants") about the possibility of licensing IQ Banker's market-intelligence product, which details the supply-chain relationships between companies. After being given access to IQ Banker's proprietary database pursuant to a confidentiality agreement, ostensibly to conduct diligence on the deal, Defendants allegedly scraped swaths of IQ Banker's proprietary information. No deal ever materialized, but Defendants allegedly used the information stolen from IQ Banker to launch their own, competing product. IQ Banker now brings trade-secret misappropriation and breach claims, which are the subject of the instant motions to dismiss from both SPGMI and SPG. The Court grants these motions in part and denies them in part. Because IQ Banker has not described its alleged trade secrets with sufficient particularity, the Court dismisses the misappropriation claims, albeit with leave to amend. And because IQ Banker has failed to plead facts establishing SPG's liability for breach of contract, that claim against it is also dismissed, without prejudice as well. The breach claim as to SPGMI, however, survives.

## BACKGROUND[1]

Plaintiff IQ Banker is a limited liability company incorporated in Nevada. Dkt. 1 ("Compl.") ¶ 2. Defendants SPGMI and SPG are two distinct, but related, corporate entities incorporated in Delaware and New York, respectively. *Id.* ¶¶ 4–5.[2]

IQ Banker is a market-intelligence company which "gathers large quantities of raw data" from public sources, then "organizes and analyzes information it has collected" to extract "valuable information about the worldwide chain of supply of goods and services." Compl. ¶¶ 16, 28. IQ Banker terms this information "quantifiable supply chain intelligence," meaning information "that describe[s] and measure[s] customer-supplier relationships between companies" that is also quantifiable, or "not merely qualitative information." *Id.* ¶ 17. What IQ Banker is really trying to get at—and what its customers pay for—is a calculation of "how much of a supplier's total revenue is attributable to each of its customers." *Id.* ¶¶ 17–18. IQ Banker hosts this information on a platform, on which it provides its customers "its complete datasets and creates graphics, tables, and modules that visually depict trends and relationships." *Id.* ¶ 20.

In 2019, S&P's Chief Data and Technology officer approached IQ Banker about the possibility of licensing IQ Banker's data or developing a joint product.[3] *Id.* ¶ 38. S&P's then-existing products did not include "quantifiable supply chain intelligence comparable to" that created by IQ Banker. *Id.* ¶ 39. S&P eventually requested access to IQ Banker's platform, which the parties agreed would be granted once they executed a confidentiality agreement. *Id.* ¶ 41. As

---

[1] The following facts are taken from the Complaint, Dkt. 1, and assumed to be true for the purposes of this Opinion and Order resolving Defendants' motions to dismiss. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).
[2] The Complaint does not detail the relationship between the two entities, but SPG asserts that SPGMI is its wholly-owned subsidiary. SPG Br. at 2.
[3] IQ Banker does not specify for which S&P entity this individual worked. *See* Compl. ¶ 38.

a result, in June 2019, IQ Banker and SPGMI signed the Mutual Confidentiality Agreement. Compl. Ex. 1 ("MCA").

The MCA defines "Confidential Information" as "information and data received by the Receiving Party from the Disclosing Party which has been marked 'Proprietary and Confidential' by the Disclosing Party, or in respect of which the Receiving Party has received from the Disclosing Party specific written notice of its proprietary and confidential nature." MCA ¶ 1.[4] The MCA also provides that the "Receiving Party shall not disclose, directly or indirectly, in whole or in part, to any third person, firm or corporation, any Confidential Information which it receives from the Disclosing Party, and may only use such Confidential Information in connection with evaluating a possible business relationship between the parties." *Id.* ¶ 2.

After the MCA was executed, IQ Banker provided S&P with "exclusive, non-transferrable" usernames and passwords for what S&P characterized as "a quick spot check of the Platform[,] which would normally be expected to take no longer than a few days." Compl. ¶ 48. Thereafter, at S&P's request, IQ Banker undertook a project to "map the identities of entities within its Dataset sorted in the Platform" to S&P's system—essentially, to make its database interoperable with those used by S&P. *Id.* ¶ 51.

By August 2019, S&P had still not completed its review. It asked for several more login credentials, which were provided to "senior [S&P] leaders in New York City" by IQ Banker. *Id.* ¶ 56. But the diligence process would drag on. Other S&P "entities," such as "S&P Global Ratings" and "S&P Dow Jones Indices LLC" "sought to establish relationships with IQ Banker." *Id.* ¶ 64. In 2021, IQ Banker informed S&P that the MCA does not permit S&P to "use the

---

[4] The MCA defines "Receiving Party" as "the party that is receiving information under this Agreement" and "Disclosing Party" as "the party that is disclosing information under this Agreement." MCA at 1. For the purposes of this action, SPGMI is the Receiving Party and IQ Banker is the Disclosing Party.

Platform for any re-engineering or internal product research and/or development," and S&P responded that it had "purged" "the IQ Banker data that S&P had previously possessed." *Id.* ¶¶ 62–63.

In October 2023, the head of S&P's "Quantamental" team met with representatives from IQ Banker. *Id.* ¶ 71. He "focused his discussion on questions about IQ Banker's supply chain information and data collection methodologies," which made clear to IQ Banker that "he was not interested in licensing data from IQ Banker, but that he was interested in how to create such data and how to replicate it." *Id.* ¶¶ 72–73. Rattled by this encounter, IQ Banker decided, that same month, to initiate an investigation as to how S&P had handled its intellectual property. *Id.* ¶ 75.

According to the Complaint, "[i]n late 2023 and early 2024, IQ Banker found evidence, resulting from its investigation of significant unauthorized access by S&P personnel" to "highly sensitive and confidential materials." *Id.* ¶ 76. At least one of the login credentials, ostensibly provided to individuals in New York, was being used to access IQ Banker's platform from IP addresses connected to S&P's offices in India. *Id.* ¶ 77. This account had "accessed sensitive materials almost daily and for months, with over one thousand page views of IQ Banker's sensitive and confidential trade secrets and data collection methodologies for hundreds of companies." *Id.* ¶ 78. IQ Banker even found a LinkedIn profile allegedly belonging to a S&P employee in India which stated that the employee "Researched on Evaluation of IQ Banker Platform tool to identify Revenue Recognition methodologies resulted in many key findings which are now helpful in the revenue collection process." *Id.* ¶ 79. IQ Banker also discovered that other accounts it had issued to S&P "improperly accessed . . . sensitive materials . . . with a focus on IQ Banker's data collection methodologies and processes." *Id.* ¶ 81.

S&P did not, ultimately, do a deal with IQ Banker.  Instead, it launched its own, competing product in 2023.  *Id.* ¶ 69.

IQ Banker now brings trade-secret misappropriation claims against both SPGMI and SPG under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq*., and New York common law.  Compl. ¶¶ 85–103 (DTSA claim); *id.* ¶¶ 111–117 (common-law misappropriation claim).  It also brings a claim for breach of the MCA against both defendants.  *Id.* ¶¶ 104–110.  It further seeks an accounting for S&P's profits wrongfully derived from the use of IQ Banker's trade secrets, punitive and exemplary damages, and fees and costs.  *Id.* at 30–31.  Both SPGMI and S&P filed motions to dismiss, Dkt. 22 ("SPGMI Br."); Dkt. 24 ("SPG Br."), to which IQ Banker responded,  Dkt. 30 ("Pl.'s SPGMI Opp'n"); Dkt. 31 ("Pl.'s SPG Opp'n"), and S&P replied.  Dkt. 33 ("SPGMI Repl."); Dkt. 34 ("SPG Repl.").

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[5]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action," which are "supported by mere conclusory statements, do not suffice." *Id.*

In deciding a motion to dismiss, the Court "constru[es] the complaint liberally, accept[s] all factual allegations in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002), although it need not "accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at

---

[5] Unless otherwise indicated, quotations omit all internal citations, quotation marks, footnotes, and omissions, and adopt alterations.

555. A court may, however, consider "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers*, 282 F.3d at 153.

## DISCUSSION

### I. SPGMI

IQ Banker brings federal and state trade-secret misappropriation claims and a breach of contract claim against SPGMI. The Court addresses each in turn, and concludes that, while the trade secret claims must be dismissed, IQ Banker has stated a claim for breach of contract.

### A. Trade Secret Claims

SPGMI first argues that IQ Banker's trade secret misappropriation claims—brought under the DTSA and New York State law—should be dismissed because IQ Banker has neither pled that it possesses trade secrets nor pled that SPGMI misappropriated them. The Court agrees that IQ Banker has not pled the existence of trade secrets with the required specificity.

"To state a claim of trade secret misappropriation under the DTSA, a plaintiff must plausibly allege both that: (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." *Onyx Renewable Partners L.P. v. Kao*, 2023 WL 405019, at *2 (S.D.N.Y. Jan. 25, 2023). Likewise, to state a claim of trade secret misappropriation under New York law, "a plaintiff must show (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as the result of discovery by

improper means." *Pauwels v. Deloitte LLP*, 83 F.4th 171, 181 (2d Cir. 2023). Because the "elements for a misappropriation claim under New York law are fundamentally the same as a DTSA claim, courts have found that a complaint sufficiently pleading a DTSA claim also states a claim for misappropriation of trade secrets under New York law." *Catalyst Advisors, L.P. v. Catalyst Advisors Investors Glob., Inc. ("Catalyst I")*, 602 F. Supp. 3d 663, 671 (S.D.N.Y. 2022); *see Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020).

The DTSA defines "trade secret" to include "all forms and types of financial, business, scientific, technical, economic, or engineering information" so long as (i) the owner "has taken reasonable measures to keep such information secret" and (ii) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

"'The existence, *vel non*, of a trade secret usually is treated as a question of fact,' and properly within the province of the jury." *Catalyst Advisors, LP v. Catalyst Advisors Investors Glob. Inc. ("Catalyst II")*, 2024 WL 522751, at *18 (S.D.N.Y. Feb. 9, 2024) (quoting *Chevron U.S.A., Inc. v. Roxen Serv., Inc.*, 813 F.2d 26, 29 (2d Cir. 1987)). "The question of whether proprietary information qualifies as a trade secret" therefore, "is ordinarily . . . not resolvable on a motion to dismiss," and trade secret "claims should only be dismissed for failure to state a claim where the purported trade secrets are not actually secret or there is no discernible economic value from them not being generally known." *Onyx Renewable Partners*, 2023 WL 405019, at *2. Courts in this District have, furthermore, routinely required that a plaintiff plead their trade secrets with "sufficient specificity to inform defendants of what they are alleged to have misappropriated." *Onyx Renewable Partners*, 2023 WL 405019, at *2 (collecting cases); *see, e.g.*, *Sit-Up Ltd. v.*

*IAC/InterActiveCorp.*, 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008) (observing that "[e]very court to have opined on this issue has ruled that specificity is required," and collecting cases). *Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 258–59 (S.D.N.Y. 2014), *aff'd sub nom. Big Vision Private Ltd. v. E.I. du Pont de Nemours & Co.*, 610 F. App'x 69 (2d Cir. 2015) ("The requirement of particularity exists for the simple reason that a defendant must know what constitutes a plaintiff's trade secret."). Thus, "to survive a motion to dismiss, a party alleging that it owns a trade secret must put forth specific allegations as to the information owned and its value," *Elsevier Inc. v. Dr. Evidence, LLC*, 2018 WL 557906, at *4 (S.D.N.Y. Jan. 23, 2018), though a plaintiff "need not divulge every detail of a trade secret." *Pauwels v. Deloitte LLP*, 2020 WL 1818742, at *4 (S.D.N.Y. Feb. 19, 2020), *rev'd on other grounds*, 83 F.4th 171 (2d Cir. 2023).

Courts in this District generally apply the six-factor test articulated in the Restatement (First) of Torts to determine whether, under both the DTSA and New York state law, information constitutes a trade secret. *See, e.g.*, *Catalyst I*, 602 F. Supp. 3d at 672 (applying the Restatement test). These factors are:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Onyx Renewable Partners*, 2023 WL 405019, at *2. "These factors are guideposts, not elements, and a plaintiff need not plead every single factor for the relevant information to constitute a trade secret." *Id.*; *Iacovacci*, 437 F. Supp. 3d at 380.

IQ Banker identifies, "among other things," five categories to which the trade secrets allegedly misappropriated by S&P "relate." Compl. ¶ 87. These are:

> (a) its list of companies containing traces of quantifiable supply chain information or revenue and related entities, (b) the knowledge of how and where to find the source documents, (c) the location of the supply chain information within those documents, (d) point-in-time and methodologies and frameworks within the corporate hierarchy relationships of quantifiable supply chain data, and (e) its data collection and derivation methods, including its revenue recognition methodologies, which result in a proprietary quantifiable data set and related insights regarding the sourcing of such information and organization of such information in order to generate precise and up-to-date quantifiable market intelligence that may be used in a variety of industries.

*Id.*[6]  SPGMI launches a series of attacks on these alleged trade secrets, which boil down to arguments that (1) the alleged trade secrets cannot be trade secrets as a matter of law because they either constitute public information or are simply methods of reading public information, and (2) that IQ Banker fails to plead these trade secrets with the required specificity.  The Court concludes that although the type of information IQ Banker seeks to protect could plausibly be a trade secret, it has failed to plead these alleged trade secrets with adequate specificity.

Viewing the allegations in the light most favorable to IQ Banker, the Court understands that what IQ Banker seeks to protect is more than just "publicly available information," as SPGMI argues.  IQ Banker appears to be claiming that the steps it takes to identify and analyze useful supply-chain information from public documents, as well as the results of that analysis, namely the upstream and downstream relationships it identifies between companies and the revenue recognized by one company from sales to another company, are what constitute its protectable trade secrets.  *See* Pl.'s SPGMI Opp'n at 15 (discussing how IQ Banker "collect[s] and store[s] publicly available information," then applies "proprietary models and methodology to transform

---

[6] As SPGMI points out, IQ Banker has alleged its trade secrets in a nonexclusive way.  *See* Compl. ¶ 87 ("IQ Banker's trade secrets and confidential information relate to, among other things . . .").  Courts generally require a plaintiff to "identify each alleged secret with reasonable particularity, without resort to qualifying language like 'for example' or 'including' to broaden the scope" of its pleadings.  *Carl Zeiss X-Ray Microscopy, Inc. v. Sigray, Inc.*, 2021 WL 5197215, at *4 (N.D. Cal. Nov. 9, 2021); *see Quanzhou New Hunter Bags & Luggages (Light Industry) Co. v. Spray Moret, LLC*, 2026 WL 538578, at *3 (S.D.N.Y. Feb. 26, 2026).  Accordingly, the Court will only analyze the purported trade secrets actually alleged in the Complaint.

that data into competitively valuable information,"); Compl. ¶¶ 16–18 (describing the creation of "quantifiable supply chain intelligence," which consists of "sets of information and analytics that describe and measure customer-supplier relationships between companies across the world, and, particularly, . . . how much of a supplier's total revenue is attributable to each of its customers.").

SPGMI argues that the categories of information identified by IQ Banker in its complaint amount to "just a list of public information" or "ways to find or read public information" and cannot, therefore, be protected by the DTSA or state law because "compilations of information consisting of only public information, without more, do not qualify as trade secrets." SPGMI Br. at 8, 10, 12.

It is true that, in general, "[f]or a plaintiff to claim entitlement to trade secret protection, 'the subject matter of a trade secret must be secret.'" *Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 258 (S.D.N.Y. 2021) (quoting *Speedry Chem. Prods., Inc. v. Carter's Ink Co.*, 306 F.2d 328, 331 (2d Cir. 1962)). Nevertheless, both public information and private information derived from public information can constitute a trade secret, at least in certain circumstances. As SPGMI acknowledges, "[a] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Integrated Cash Mgmt. Servs., Inc. v. Digit. Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990). Accordingly, courts in this District have afforded plaintiffs what is termed "compilation trade secret protection," which is "protection solely for [a] plaintiff's unique manner of combining certain pieces of public information into a commercially advantageous business model." *Sit-Up Ltd.*, 2008 WL 463884, at *11.

10

SPGMI bases much of its argument here on cases within this District which have denied trade secret protection to customer lists which have been collected from publicly-available sources. SPGMI Br. at 10–14; *see, e.g.*, *MedQuest Ltd. v. Rosa*, 2023 WL 2575051, at *5 (S.D.N.Y. Mar. 20, 2023); *Mkts. Grp., Inc. v. Oliveira*, 2020 WL 820654, at *8 (S.D.N.Y. Feb. 3, 2020), *R. & R. adopted*, 2020 WL 815723 (S.D.N.Y. Feb. 19, 2020).  In general, "[a] customer contact list that required substantial time, effort and money to compile may be deemed a trade secret where it contains information that is not readily available." *Intrepid Fin. Partners, LLC v. Fernandez*, 2020 WL 7774478, at *3 (S.D.N.Y. Dec. 30, 2020).

These customer-list cases thus draw a distinction between a compilation of public information which is merely difficult or arduous to assemble, which does not constitute a trade secret, and a compilation of public information assembled through the application of some variety of non-public knowledge or expertise, which can.  Many of these customer-list cases, for example, distinguish *prospect* lists—that is, lists of companies that would potentially be interested in a service—from *client* lists, that is, lists of companies that actually use a service.  The former, while an "arduous task" to assemble, is ultimately a list of information that is "readily ascertainable," and is "not alone sufficient to confer protection." *MedQuest Ltd.*, 2023 WL 2575051, at *4.  The latter may, in some circumstances, contain private information through the "development" and application of "a specialized knowledge of the customer's operations and needs," *Webcraft Techs., Inc. v. McCaw*, 674 F. Supp. 1039, 1046 (S.D.N.Y. 1987), "individual customer preferences," *N. Atl. Inst., Inc. v. Haber*, 188 F.3d 38, 46 (2d Cir. 1999), or other "non-public, customer-specific data." *Mkts. Grp., Inc.*, 2020 WL 820654, at *8.  These client lists might also contain company "work product," such as "internal notes" or "summaries," explicitly reflecting "the specific preferences" of the listed companies. *Catalyst II*, 2024 WL 522751, at *21. Or they might require

"a tremendous amount of legwork, time, resources, and relationship building" with individuals and companies to get them to "share such sensitive information" with a plaintiff. *Zebra Strategies, Inc. v. Gonzalez-Nazario*, 764 F. Supp. 3d 144, 155 (S.D.N.Y. 2025).

As applied to the instant motion to dismiss, the customer-list cases stand for the proposition that IQ Banker's methods of compiling public information—along with the compiled information itself—could constitute a protectable trade secret if the compilation process involves the application of specialized, non-public knowledge or data. Problematically for IQ Banker, though, its Complaint contains almost no allegations as to how the compilation of its supply chain datasets actually happens. Put another way, IQ Banker has not alleged the existence of its trade secrets with sufficient particularity.

"Naturally, a DTSA plaintiff has no obligation to reveal its secrets in the complaint simply to prove that they exist." *TRB Acquisitions LLC v. Yedid*, 2021 WL 293122, at *2 (S.D.N.Y. Jan. 28, 2021). But "that does not mean a party can get away with nebulous descriptions at the highest level of generality." *Ad Lighting Inc. v. Clean.io, Inc.*, 2020 WL 4570047, at *2 (S.D.N.Y. Aug. 7, 2020). "[G]eneral and vague references to methods, processes, interpretation, programs, and data configuration protocols do not plausibly support the existence of a trade secret without supportive facts explaining, for example, how such strategies, techniques or models function, how [the plaintiff] derives value from them, or what [the plaintiff] specifically does to ensure their secrecy." *Intrepid Fin. Partners, LLC*, 2020 WL 7774478, at *4. At bottom, "a complaint that only claims general categories of information and data as trade secrets does not state a claim under the DTSA because it does not adequately put the defendant on sufficient notice of the contours of the claim for misappropriation." *Quanzhou New Hunter Bags & Luggages (Light Industry) Co. v. Spray Moret, LLC*, 2026 WL 538578, at *3 (S.D.N.Y. Feb. 26, 2026).

The extent of the allegations in the Complaint as to what IQ Banker actually does to generate "quantifiable supply chain intelligence" is as follows. Compl. ¶ 27. IQ Banker collects "millions of public filings and various documents" and applies "proprietary processes and frameworks" to home in on the "key documents." *Id.* ¶ 28. These "processes involve uncovering relationships, identifying and analyzing their economic value, and calculating the impact of corporate hierarchy on these connections to represent accurately the economic exposure of such relationships." *Id.* In other words, it uses "proprietary analytics" to determine "how much of a supplier's total revenue is attributable to each of its customers." *Id.* ¶¶ 17–18.

The issue for IQ Banker, though, is that it provides no detail as to what these proprietary processes, frameworks, or analytics are or how they transform public information into something protectable. In the *Intrepid Financial Partners* case, now-Chief Judge Swain found a trade secret claim to be insufficiently plead where a plaintiff did not provide "supportive facts" as to how specific models or strategies functioned or why they are unique to the plaintiff's business. 2020 WL 7774478, at *4. *Elsevier* is also instructive; there, the plaintiff sought to protect certain "data configuration protocols and methods," "clinical methods relating to executing projects," "processes to assess the quality of evidence," and "interpretation[s] of data." 2018 WL 557906, at *5–6. The court noted that the plaintiff had "failed to explain how these methods, processes, and interpretations function," and merely alleged "general categories of information," which is not protectable.[7] *Id.*, at *6. Similarly, in *Quanzhou New Hunter Bags & Luggages*, Judge Oetken recently held that alleged trade secrets which merely "gesture at 'methods, techniques and processes' that touch on generic components of the manufacturing process" were insufficient

---

[7] In *Elsevier*, Judge Forrest also indicated, however, that all that might be required to find the existence of a trade secret is a plaintiff's allegation that its protectable methodology "relies on a specific, proprietary algorithm developed at a certain time and which no one else owns." 2018 WL 557906, at *6.

13

because the allegations did not "explain how these techniques operate . . . or how easily they might be acquired by others."  2026 WL 538578, at *3.

IQ Banker's alleged trade secrets are "similarly, and fatally, vague."  *Id.* at *4. Accordingly, because IQ Banker has not sufficiently alleged that it possesses any trade secrets, as is required under both the DTSA and state law, its trade-secret misappropriation claims must be dismissed.[8]  The Court, therefore, does not reach SPGMI's argument that IQ Banker has not adequately pled misappropriation by SPGMI.

### B.  Breach of Contract Claim

Next, SPGMI argues that the Court should dismiss IQ Banker's breach of contract claim because IQ Banker "fails to allege a critical condition precedent to the enforcement of the MCA." SPGMI Br. at 22.  The MCA requires that the "Receiving Party"—SPGMI—"shall not disclose, directly or indirectly, . . . any Confidential Information which it receives" from the "Disclosing Party," meaning IQ Banker.  MCA ¶ 2.  "Confidential Information" is defined as "information and data received by the Receiving Party from the Disclosing Party which has been marked 'Proprietary and Confidential' by the Disclosing Party, or in respect of which the Receiving Party

---

[8] SPGMI also argues that because "other companies compile this kind of information," it cannot be protectable as a compilation trade secret.  SPGMI Br. at 12.  It is true that "in cases where protection for a plaintiff's overarching business method has been granted," under a combination-trade-secret theory, "the plaintiff has been required to adduce evidence showing that its business methods were unique in their manner of combining various constituent elements." *Sit-Up Ltd*, 2008 WL 463884, at *9; *see Hayden v. Int'l Business Machines Corp.*, 2025 WL 1697021, at *13 (S.D.N.Y. June 17, 2025) ("A plaintiff asserting a combination trade secret must demonstrate that the way in which the publicly-available components fit together is unique and not publicly-known.").

*Sit-Up* and *Hayden*, however, considered a trade-secret claim at the summary-judgment stage, and *Sit-Up* suggested that such a factual showing is not required on a motion to dismiss.  *Sit-Up Ltd.*, 2008 WL 463884, at *10 n.8 (discussing, with approval, *Alnwick v. Eur. Micro Holdings, Inc.*, 281 F. Supp. 2d 629, 638 (E.D.N.Y. 2003), in which the court did not require a plaintiff to show that its compilation trade secret was unique to survive a motion to dismiss). All a plaintiff must offer, at this stage, are allegations "sufficient for the Court to discern the general contours of the alleged trade secrets . . . and for Defendant to be put on notice of the claim," even if that claim "may eventually fail if discovery reveals that the technology that they seek to protect is not in fact unique."  *Next Commc'ns Inc. v. Viber Media, Inc.*, 2016 WL 1275659, at *4 (S.D.N.Y. Mar. 30, 2016).  The Court will not, therefore, dismiss the trade-secret misappropriation allegations in the Complaint on this basis.

has received from the Disclosing Party specific written notice of its proprietary and confidential nature." *Id.* ¶ 1. SPGMI argues that the Complaint fails to allege either that the information it received from IQ Banker was marked proprietary and confidential or that IQ Banker provided specific written notice that any information it provided to SPGMI was confidential. SPGMI Br. at 23. As a result, the argument goes, SPGMI has not breached its obligations under the MCA. *Id.*

The MCA is governed by New York law. MCA ¶ 9. "Under New York law, the initial interpretation of a contract is a matter of law for the court to decide. Where the agreement is unambiguous, a court may not admit extrinsic evidence and interprets the plain language of the agreement as a matter of law." *Kamafar v. New World Rest. Grp., Inc.*, 347 F. Supp. 2d 38, 48–49 (S.D.N.Y. 2004). When interpreting a contract under New York law, "[w]ords and phrases are given their plain meaning," and "each word must be given meaning." *In re Celsius Network LLC*, 649 B.R. 87, 102–03 (Bankr. S.D.N.Y. 2023). "In interpreting a contract, courts examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *Alto v. Sun Pharm. Indus., Inc.*, 2021 WL 4803582, at *35 (S.D.N.Y. Oct. 13, 2021).

"On a motion to dismiss, the Court may resolve issues of contract interpretation when the contract is properly before the Court, but must resolve all ambiguities in the contract in Plaintiff['s] favor." *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 328 (S.D.N.Y. 2010). "However, the mere fact that the Parties disagree on the proper interpretation of the contract does not render the contractual language ambiguous." *Id.* at 329. "Contract language is not ambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract

itself, and concerning which there is no reasonable basis for a difference of opinion." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989).  Conversely, a contract is ambiguous if a "reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).

Resolving this question involves determining what constitutes "specific written notice" of a given piece of information's "proprietary and confidential nature" under the MCA, as IQ Banker does not allege that it ever provided information to SPGMI with a "Proprietary and Confidential" marking.  Instead, IQ Banker points to several instances in which it allegedly told SPGMI that the data it was sharing was "confidential."  *See* Compl. ¶ 52 ("At that time, IQ Banker also reminded S&P of its confidentiality obligations, because the information continued to constitute sensitive trade secrets belonging to IQ Banker."); *id.* ¶ 53 ("Consistent with its usual practice with any third-party accessing IQ Banker's confidential information by agreement, IQ Banker reinforced to S&P the proprietary nature of the Datasets and that the information constituted IQ Banker's trade secrets."); *id.* ¶ 61 ("As part of its usual practice, IQ Banker, including throughout 2021, routinely reminded S&P of its confidentiality obligations under the MCA and that IQ Banker's data was not to be used for independent or internal research and development purposes by S&P except as permitted by the MCA.").

The term "specific written notice" in the MCA strikes the Court as unambiguous, in that the only possible meaning to ascribe to the phrase is that any notice that information shared with SPGMI is covered by the MCA must be in writing.  Furthermore, to give content to the word "specific," written notice given pursuant to the MCA must indicate what specific pieces of information are designated as Confidential Information under the MCA.  *Cf. Alto*, 2021 WL

16

4803582, at *35–36 (interpreting the phrase "prior written notice" and finding that it is unambiguous).  The portions of the Complaint identified by IQ Banker, even viewed in the light most favorable to it, fail to raise the inference that IQ Banker properly designated any information as Confidential Information under the MCA.  IQ Banker does not allege that any of its communications regarding confidentiality were in writing, and it does not allege that its communications specifically identified a set of information to be designated as Confidential Information under the MCA.  If IQ Banker and SPGMI had intended that *all* information shared between them should have been considered Confidential Information, they could have assented to that in the MCA.  Instead, the parties contracted for a system that requires specific designation to trigger confidentiality obligations.

IQ Banker also argues that the requisite written notice was given in the IQ Banker platform itself.  This argument is more compelling.  IQ Banker notes that SPGMI's employees accessing the IQ Banker platform were greeted, upon each login, with written notice that "IQ Banker does not allow . . . the sharing of product screenshots," and that "unauthorized sharing of access or information is a violation of IQ Banker's licensing terms of use."  Compl. ¶ 36.  This warning language, which appears to indicate that the information on the IQ Banker platform is confidential, could plausibly fall within the unambiguous language of the MCA, which requires the provision of "specific written notice of [the protected information's] proprietary and confidential nature."  MCA ¶ 1.

Viewing the allegations in the Complaint in the light most favorable to IQ Banker, this language related to "unauthorized sharing of access or information" is thus, at least on this posture, sufficient to establish the "proprietary and confidential nature" of the information accessed.  Accordingly, the Court will not dismiss the breach claim against SPGMI.

## II. SPG

In the Complaint, IQ Banker generally does not distinguish between actions alleged to have been taken by SPGMI and actions alleged to have been taken by S&P Global, SPGMI's parent company. Instead, it largely refers to both defendants collectively as "S&P," and brings state and federal trade secret misappropriation and breach claims against both companies. Nevertheless, IQ Banker has an obligation to articulate independent claims as to each Defendant because it is "a general principle of corporate law" that, in the ordinary course, "a parent corporation is not liable for the acts of its subsidiaries." *Yankee Gas Servs. Co. v. UGI Utils.*, 428 F. App'x 18, 20 (2d Cir. 2011) (summary order) (quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)).

A plaintiff may seek to impose liability on a parent corporation for a subsidiary's acts through the application of the veil-piercing doctrine, which permits a court to equitably remove liability-limiting features of the corporate form. *See Morris v. N.Y.S. Dep't of Tax'n & Fin.*, 82 N.Y.2d 135, 140–41 (1993); *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008). Because SPGMI is a Delaware corporation, the Court assumes, without deciding, that Delaware law would presumptively apply to an attempt to invoke this doctrine as to SPGMI. *See Nat'l Gear & Piston Inc. v. Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 401 (S.D.N.Y. 2013) (applying Delaware law to a "veil-piercing theory of liability" because the entity in question was incorporated there).[9]

---

[9] The parties did not brief what state's law would apply to this issue, and the Court notes that, in a federal-question case with pendent state-law claims, "the choice-of-law rule that applies [to those claims] . . . is not settled." *Thomas v. Nat'l R.R. Passenger Corp.*, 2025 WL 2771594, at *3 (S.D.N.Y. Sept. 30, 2025). But it need not decide, at this juncture, whether to apply the federal common-law choice-of-law rules or the choice-of-law rules of New York, the forum state, to decide what state's veil-piercing doctrine applies. As discussed below, IQ Banker has not pled sufficient facts to invoke it under either New York or Delaware law, the two jurisdictions whose law would likely apply under either choice-of-law approach. *See id.* at *3 n.7 ("Where the court has determined that the result would be the same under either jurisdiction's law, it need not decide which one to apply." (quoting *Fin. One Public Co. v. Lehman Bros Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005))).

IQ Banker vaguely gestures at this doctrine in its opposition to SPG's motion to dismiss, where it asserts that SPG "disregard[ed] the corporate formalities," and thus should be liable for SPGMI's acts, because SPG "does not differentiate between its employees in different business units." Pl.'s SPG Opp'n at 3. This argument fails for two reasons. First, IQ Banker did not allege as much in the Complaint. Second, even if it had, this assertion, standing alone, is insufficient to invoke the veil-piercing doctrine; under Delaware law, a plaintiff must demonstrate that the parent and subsidiary operate as a "single economic entity" such that the subsidiary "no longer has legal or economic significance of its own." *Nat'l Gear*, 975 F. Supp. 2d at 402–03; *see, e.g.*, *Wallace ex rel. Cencom Cable Income Partners II v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999). A plaintiff must additionally show that "an overall element of injustice or unfairness is present," traceable to "an abuse of the corporate form." *Nat'l Gear*, 975 F. Supp. 2d at 406; *see, e.g.*, *Wallace*, 752 A.2d at 1184. The allegations in the Complaint do not demonstrate that either factor is satisfied.[10] As a result, liability is not automatically imputed to SPG for SPGMI's alleged acts under a veil-piercing theory, and SPG is not, therefore, indirectly liable for the claims against SPGMI.

## A. Trade Secret Claims

Next, the Court will turn to the substantive claims against SPG, and will begin with the trade secret claims. IQ Banker asserts that SPG is directly liable for trade-secret misappropriation, under federal and state law, because "SPG employees in India . . . accessed the IQB Platform" without authorization. Pl.'s SPG Opp'n at 3; Compl. ¶¶ 75–78. These claims can be quickly

---

[10] Nor does IQ Banker meet its burden to plead veil-piercing under New York law, were it to apply instead of Delaware law. New York applies a substantially similar standard to Delaware: a plaintiff must allege (1) a third party "exercised complete domination of the corporation in respect to the transaction being attacked," and (2) that this third party "used its control over the corporation to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 126 F. Supp. 3d 388, 402 (S.D.N.Y. 2015); *see Morris*, 82 N.Y.2d at 141. For similar reasons, IQ Banker does not sufficiently allege facts to support a finding that either factor applies.

disposed of, however:  because the Court has concluded that IQ Banker has failed to allege the existence of a trade secret, as discussed above, IQ Banker does not state a claim against SPG for trade-secret misappropriation.

### B.  Breach of Contract Claim

The Court also concludes that IQ Banker has not adequately pled that SPG is directly liable for breach of contract.  As SPG notes, IQ Banker alleged that "the Parties," which is defined to include SPG, "entered into the MCA."  Compl. ¶ 41; *id.* at 2.  IQ Banker also alleged that "S&P," which is defined to include SPG, "breached its contractual obligations under the MCA."  *Id.* ¶ 106; *id.* at 1.  SPG, however, is not a signatory to the MCA—only SPGMI and IQ Banker are—and thus, ordinarily, cannot be liable for its subsidiary's alleged breach of that contract without well-pled allegations to support some other theory of liability.  MCA at 2; *see, e.g.*, *In re JPMorgan Chase Cash Sweep Program*, 2026 WL 396055, at *4–5 (S.D.N.Y. Feb. 12, 2026) (detailing theories of parent company liability for breach based on an intent to be bound by its subsidiary's contract and an agency relationship).[11]

IQ Banker argues, in its opposition to SPG's motion to dismiss, that even if SPG did not sign the MCA, it nevertheless manifested an intent to be bound by its terms "by requesting" that a member of the "Quantamental team to be permitted access to trade-secret know-how about [IQ Banker's] supply chain information and data methodologies."  Pl.'s SPG Opp'n at 3.  This argument is unavailing.  It is true that, under New York law, a parent corporation can manifest an intent to be bound to a subsidiary's contract, which is based on an assessment of "the totality of [the parent corporation's] expressed words and deeds."  *MBIA Ins. Corp. v. Royal Bank of Can.*,

---

[11] Even on a motion to dismiss, the plain language of the MCA trumps the allegations in the Complaint.  "[I]f the allegations of a complaint are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the complaint."  *Sazerac Co. v. Falk*, 861 F. Supp. 253, 257 (S.D.N.Y. 1994).

706 F. Supp. 2d 380, 397 (S.D.N.Y. 2009). Such intent is generally inferred where a parent corporation negotiates a contract "but has a subsidiary sign it, if the subsidiary is a dummy for the parent corporation," *Warnaco Inc. v. VF Corp.*, 844 F. Supp. 940, 946 (S.D.N.Y. 1994), or where the subsidiary is an alter ego of the parent corporation such that the veil-piercing doctrine would apply. *Jennings v. Hunt Cos., Inc.*, 367 F. Supp. 3d 66, 71 (S.D.N.Y. 2019). Here, IQ Banker has not alleged that the Quantamental team member was even an employee of SPG, *see* Compl. ¶¶ 71–74 (describing this individual as "the head of S&P's 'Quantamental' Team,"), and has not otherwise alleged that SPG participated in the negotiation of the MCA, or established that the veil-piercing doctrine would apply. In other words, IQ Banker can point to no words or acts taken specifically by SPG that were directed towards the MCA, much less demonstrate that SPG intended to be bound by it. As a result, IQ Banker's breach claim against SPG must be dismissed.

### III. Statute of Limitations and Leave to Amend

Finally, IQ Banker requests leave to amend, which SPGMI opposes. Pl.'s SPGMI Opp'n at 25; SPGMI Repl. at 12. Federal Rule of Civil Procedure 15(a) provides that "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a); *see Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000). The Second Circuit has stated that courts should generally grant leave to amend a complaint "with the benefit of a ruling" on a motion to dismiss. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 190–91 (2d Cir. 2015). The Supreme Court has also instructed that it would be an abuse of discretion for a district court to deny leave to amend without some justification. *Foman v. Davis*, 371 U.S. 178, 181–182 (1962). One such justification is that amendment would be futile. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Another would be "undue prejudice" to Defendants. *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 454 (S.D.N.Y. 2016).

SPGMI argues that amendment of the trade secret claims would be futile because they are time-barred. SPGMI Br. at 6–8; SPGMI Repl. at 3–4. "A statute of limitations affirmative defense normally cannot be decided on a motion to dismiss." *Markel Am. Ins. Co. v. Mr. Demolition, Inc.*, 717 F. Supp. 3d 238, 244 (E.D.N.Y. 2024). "Where the dates in a complaint show that an action is barred by a statute of limitations," however, "a defendant may raise the affirmative defense in a pre-answer motion to dismiss." *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989). "The rule in the statute of limitations context is that dismissal is appropriate only if a complaint clearly shows the claim is out of time." *Medcenter Holdings, Inc. v. WebMD Health Corp.*, 2021 WL 1178129, at *5 (S.D.N.Y. Mar. 29, 2021).

Federal DTSA claims are subject to a three-year statute of limitations. *Espire Ads LLC v. TAPP Influencers Corp.*, 655 F. Supp. 3d 223, 252 (S.D.N.Y. 2023). The period of limitations for federal misappropriation claims "runs from the date on which the misappropriation to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." *Id.* In other words, the limitations period begins to run when a plaintiff "knew or should have known that the alleged trade secrets were wrongfully acquired, disclosed, or used." *Uni-Sys. LLC v. U.S. Tennis Ass'n, Inc.*, 350 F. Supp. 3d 143, 178 (E.D.N.Y. 2018).

"In New York, a cause of action for the misappropriation of trade secrets" is also "governed by a three-year statute of limitations," so long as the "main remedy" sought by a plaintiff is "monetary damages" rather than "injunctive relief." *Univ. Instruments Corp. v. Micro Sys. Eng'g*, 924 F.3d 32, 49–50 (2d Cir. 2019). "New York law governing the accrual of statute of limitations," however, "is less permissive for plaintiffs than the law under the DTSA." *My Mavens, LLC v. Grubhub, Inc.*, 2023 WL 5237519, at *33 (S.D.N.Y. Aug. 14, 2023). The accrual date occurs "either when defendant discloses the trade secret or when he first makes use of plaintiff's ideas."

*iSentium, LLC v. Bloomberg Fin. L.P.*, 2020 WL 248939, at *8 (S.D.N.Y. Jan. 16, 2020). "The date of accrual may be extended under the continuing tort doctrine where the defendant has kept a secret confidential but continued to use it for commercial advantage," though this doctrine does not apply where a plaintiff "had knowledge of the defendant's misappropriation and use of its trade secret." *Synergetics US, Inc. v. Alcon Laby's, Inc.*, 2009 WL 2016872, at *2 (S.D.N.Y. July 9, 2009); *see also Univ. Instruments Corp.*, 924 F.3d at 50 (noting that the limitations period for New York trade secret claims begins to run "when a reasonably diligent person in plaintiff's position would have been put on inquiry as to the claim").

SPGMI contends that the Complaint facially establishes that both the state and federal claims are time-barred because IQ Banker had "concerns that S&P was attempting to use IQ Banker's intellectual property for its own research and development purposes" in September 2019, Compl. ¶ 59, "more than five years" before the Complaint was filed. SPGMI Br. at 7. What's more, SPGMI argues, IQ Banker could have discovered S&P's alleged misappropriation in 2019 because their system "tracks login data, including the locations from which users access the Platform." Compl. ¶ 35; SPGMI Br. at 8. IQ Banker argues that this defense is not persuasive because the Complaint explicitly pleads that IQ Banker "had no reason to believe S&P was operating in any manner that was in violation of the MCA" until a S&P employee asked questions at a meeting suggesting that S&P was "attempting to replicate IQ Banker's trade secret methodologies." Compl. ¶¶ 68–69, 74; Pl.'s SPGMI Opp'n at 7.

SPGMI's argument fails, as the Complaint does not "clearly" show that the trade secret claims are untimely. *Medcenter Holdings, Inc.*, 2021 WL 1178129, at *5. Construing the Complaint in the light most favorable to IQ Banker, the "concerns" it had in 2019 appear to be related to a draft of a Proposed Development Agreement. Compl. ¶ 59. IQ Banker alleges that it

23

had "concerns" that this Agreement, which relates to "joint product development," might be a disguised attempt to obtain and "use IQ Banker's intellectual property for its own research and development purposes." *Id.* ¶¶ 58–59. It did not plead that it was concerned or had reason to believe that S&P had misused its existing access to IQ Banker's platform under the MCA; the next paragraph notes that IQ Banker had been given "no reason not to believe that S&P would adhere to the terms of the MCA and not misappropriate IQ Banker's intellectual property." *Id.* ¶ 60. Mere doubts about the terms of a proposed contract are insufficient to find constructive notice or actual knowledge of misappropriation.

Nor does the Complaint facially show that "reasonable diligence" would have revealed S&P's alleged misappropriation. *My Mavens*, 2023 WL 5237519, at *36. As alleged, this information was gleaned from an investigation lasting at least several months, and on records not "discovered" until at least October of 2023. Compl. ¶¶ 75–76, 81. The cases on which S&P relies are distinguishable. In *My Mavens*, for example, the alleged appropriation was obvious to any of the defendant's twelve million beta users, which included a "principal" of the plaintiff company, because it was "prominently displayed" on the defendant's website. 2023 WL 5237519, at *36. In *Espire Ads*, the Court found that the plaintiff had both constructive notice of appropriation and actual knowledge where it had pled that an employee had, among other things, stolen physical company records and left a note suggesting that she had done so. 655 F. Supp. 3d at 252. And in *Knight Armament Co. v. Optical Systems Technology*, the plaintiff testified that it had "heard rumors in the marketplace (and even received anonymous tips)" about the alleged infringement— and admitted during discovery that, as a result, it contemporaneously "knew [of] or suspected" the alleged misappropriation. 654 F.3d 1179, 1186 (11th Cir. 2011). In these cases, the alleged misuse was meaningfully more obvious to the plaintiff than what IQ Banker has alleged in its Complaint.

24

Accordingly, the Court concludes that the Defendants have not met their burden to demonstrate, at this stage in the litigation, that IQ Banker's state and federal trade secret claims are time-barred. Because the Court has concluded that these claims are timely, at least at this stage of the litigation, amendment would not be futile. Furthermore, Defendants have identified no prejudice which would accrue by granting leave to amend. The Court will thus grant IQ Banker leave to amend, so long as it has a good faith basis to do so.

## CONCLUSION

For the foregoing reasons, IQ Banker's federal and state trade-secret misappropriation claims are dismissed as to both Defendants and the breach claim is dismissed as to SPG. The breach claim remains as to SPGMI. IQ Banker shall have thirty (30) days to file an Amended Complaint, so long as it has a good-faith basis to do so. The Clerk of Court is respectfully directed to terminate the motions pending at Docket Numbers 21 and 23.

SO ORDERED.

Dated:    March 30, 2026
          New York, New York

                                        Ronnie Abrams
                                        United States District Judge